UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JOHN DUBINSKY, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) No. 4:08-CV-1806 (CEJ) |
| | ) |
| MERMART, LLC, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court on defendant's motion to dismiss the complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. Plaintiffs oppose the motion and the issues have been fully briefed.

I. **Background**

Plaintiffs filed this action in the Circuit Court of the City of St. Louis, Missouri, alleging that defendant breached its contractual duty to pay interest under several "financing documents"[1] relating to the refinancing of the Merchandise Mart Apartments Project[2] in downtown St. Louis. Plaintiffs are the owners of more than 51 percent of the Series B bonds issued for the project. Defendant is the borrower of the funds created by the issuance of the Series B bonds.

---

[1] The term "financing documents" refers to the following agreements: (1) Subordinate Trust Indenture; (2) Subordination Agreement; (3) Subordinate Loan Agreement; (4) Subordinate Multifamily Note; (5) Subordinate Multifamily Deed of Trust Assignment of Rents and Security Agreement; and (6) Assignment of Subordinate Security Agreement.

[2] The project began in 2001, when defendant undertook a $47.3 million redevelopment of a long vacant and historic Merchandise Mart Building located in downtown St. Louis. The building was converted into a mixed income apartment building. In December 2005, defendant refinanced the existing indebtedness for the project by purchasing Series B bonds, of which plaintiffs are the owners.

Plaintiffs contend that defendant, either negligently or fraudulently, misrepresented to plaintiffs that the project was free from any environmental hazards, including lead-based paint. Subsequently, upon the discovery of lead-based paint within the premises, defendant characterized the cost of removal of the lead-based paint as an "upgrade" expense, when in fact the cost should have been characterized as a capital expense. This distinction is crucial for plaintiffs, because "upgrade expenses" are deducted from the calculation of the Net Operating Income ("NOI"), which is used in determining whether there is sufficient monies to make interest payments to the subordinate bondholders. Plaintiffs argue that, because the NOI was erroneously lowered, defendant avoided its obligation to make interest payments. Plaintiffs seek the interest payments they would have been entitled to under the financing documents, but for this mischaracterization. Plaintiffs also ask the Court to accelerate the payment of the principal due under the Promissory Note.

II. <u>Legal Standard</u>

The purpose of a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure is to test the legal sufficiency of the complaint. The factual allegations of a complaint are assumed true and construed in favor of the plaintiff, "even if it strikes a savvy judge that actual proof of those facts is improbable." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2007) <u>citing</u> <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 508 n.1 (2002); <u>Neitzke v. Williams</u>, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance… dismissals based on a judge's disbelief of a complaint's factual allegations"); <u>Scheuer v. Rhodes</u>, 416 U.S. 232,

236 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely"). The issue is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to present evidence in support of his claim. Id. A viable complaint must include "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp., 127 S. Ct. at 1974. See also id. at 1969 ("no set of facts" language in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), "has earned its retirement.") "Factual allegations must be enough to raise a right to relief above the speculative level." Id. at 1965.

### III. Discussion

Defendant contends that plaintiffs' complaint must be dismissed in its entirety because, pursuant to the financing documents, plaintiffs must obtain the written consent of the Senior Mortgagee prior to bringing any action to protect their subordinate interest in the property. Alternatively, defendant argues that each of plaintiff's claims should be dismissed on separate and independent grounds.

#### A. Written Consent of the Senior Mortgagee

If defendant is correct in its assertion that plaintiffs' claims are barred without the written consent of the Senior Mortgagee, then the Court need not reach defendant's separate claims for dismissal. Therefore, the Court will first turn to the issue of whether the financing documents prohibit the filing of this action without the written consent of the Senior Mortgagee.

Upon an event of default, individual bondholders must generally request that the trustee file claims on their behalf. (Subordinate Trust Indenture, § 707(a)).

However, notwithstanding this requirement, "the Bondholder Representative or the holders of not less than 51% in aggregate principal amount of Outstanding Bonds may institute any such suit, action or proceeding in their own names for the benefit of all Bondholders". (Subordinate Trust Indenture, § 707(a)).

The rights of bondholders to bring an action for an event of default "are subject to the restrictions and limitations set forth in the Subordination Agreement." (Subordinate Trust Indenture, § 210). Likewise, in the event that the trustee is filing suit on behalf of the bondholders, the trustee's ability to proceed is also "subject to the terms of the Subordination Agreement". (Subordinate Trust Indenture, § 703). Therefore, no matter whether the trustee brings suit on behalf of the bondholders, or whether the bondholders bring suit individually themselves, the terms and limitations contained within the Subordination Agreement apply.

The Subordination Agreement requires that written consent of the Senior Mortgagee[3] be obtained prior to filing suit. The Senior Mortgagee is the trustee for the senior bondholders, and the purpose of the consent requirement is to protect the senior interest in the property over the subordinated interest. Specifically, the Subordination Agreement prevents the "Subordinate Mortgagee" from appearing in or bringing "any action to protect the Subordinate Mortgagee's interest in the Mortgaged Property, or [to] take any action concerning the environmental matters affecting the Mortgaged Property." (Subordination Agreement, § 4(b)). Likewise,

---

[3]The Senior Mortgagee is identified in the document as UMB Bank, as a trustee for the senior bondholders, together with Federal Home Loan Mortgage Corporation ("Freddie Mac").

the Agreement states that, in the event of a Subordinate Mortgage default, "the Subordinate Mortgagee will not commence any Enforcement Action" without the prior written consent by the Senior Mortgagee. (Subordination Agreement, § 5(c)).

The "Subordinate Mortgagee" is identified in the documents as UMB Bank, in its capacity as trustee for the subordinate bondholders. Thus, the "Subordinate Mortgagee" in the Subordination Agreement is the same entity as the "Subordinate Trustee" referred to in the Indenture. Given that the Indenture clearly specifies that the Subordinate Trustee is restricted by the terms of the Subordination Agreement, it is clear that UMB Bank (as the Subordinate Mortgagee/Trustee) would be required to obtain the consent of the Senior Mortgagee/Trustee prior to filing this action.[4]

Plaintiffs claim that neither section 4(b) nor section 5(c) limit their ability to bring suit because they are subordinate bondholders and not the "Subordinate Mortgagee" as defined in the Subordination Agreement. Therefore, the issue becomes whether the ability of subordinate bondholders to bring suit for an alleged event of default is subject to, and limited by sections 4(b) and 5(c) of the

---

[4]Of course, UMB Bank is also the Senior Mortgagee/Trustee, which means that the Subordination Agreement, by its terms, requires UMB Bank to obtain its own consent. However, as the Subordinate Mortgagee, UMB acts only in its capacity as trustee for the subordinate bondholders. Therefore, it must act in their best interest. Likewise, as the Senior Mortgagee, UMB acts only in its capacity as trustee for the senior bondholders. Thus, while UMB serves as both the Subordinate and Senior Mortgagee, its interests are different in each capacity. Further, UMB shares the Senior Mortgagee title with Freddie Mac. Presumably, written consent from Freddie Mac would also be required in order for UMB, as the subordinate mortgagee, to file suit pursuant to the Indenture.

Subordination Agreement, even though the term "Subordinate Mortgagee" is used and not "subordinate bondholders".

It is true that neither section 4(b), nor section 5(c) of the Subordination Agreement explicitly mention the subordinate bondholders by name. However, the Court cannot interpret these provisions in isolation from the remainder of the financing documents. Instead, these sections must be viewed in light of the entire transaction and the financing documents as a whole. Upon doing so, the Court finds that section 4(b) and section 5(c) of the Subordination Agreement apply in equal force to the individual subordinate bondholders as they do to their trustee.

First, the Subordinate Trust Indenture, which provides the mechanism for the individual bondholders to file suit, explicitly states that those bondholders are subject to "the restrictions and limitations set forth in the Subordination Agreement." (Subordinate Trust Indenture, § 210). Clearly, the bondholders are subject to some restriction within the Subordination Agreement. Yet, other than the restrictions explained in section 4(b) and 5(c), there are no other portions of the Subordination Agreement which could plausibly be read to restrict the rights or remedies of the bondholders. Plaintiffs have not identified any other restrictions or limitations within the Subordination Agreement that pertain to them in any other way. Indeed, plaintiffs appear to argue that the Subordination Agreement contains no limitation on their rights or remedies under the Indenture. Such an interpretation would render meaningless section 210 of the Indenture, which explicitly limits the rights of bondholders pursuant to the restrictions contained in the Subordination Agreement. Courts avoid such an interpretation. See Fox

Midwest Theatres v. Means, 221 F.2d 173, 180 (8th Cir. 1955)("[C]ourts do not incline to declare a contract provision meaningless and will do so only when such a conclusion is either legally or factually compelled").

Further, there is simply no indication within the financing documents that it was intended for the subordinate bondholders to, in essence, defeat the purpose of the subordination agreement by filing suit without the consent of the trustee for the senior bondholders. The purpose of the entire subordinate transaction was to ensure that the "subordinate indebtedness [be] at all times...subordinate to the prior payment in full of the Senior Indebtedness." (Subordination Agreement, § 2(a)). The provision requiring the consent of the Senior Mortgagee fulfills this purpose. The Court finds that, just as the written consent requirement limits the ability of the trustee to proceed in an action to protect the subordinate bondholders' interests, the ability of the subordinate bondholders themselves to protect those same interests is similarly limited.[5]

Therefore, prior to filing this action, plaintiffs were required under the financing documents to obtain the written consent of the Senior Mortgagee. Although plaintiffs admit that they sought consent from UMB Bank as the Senior Mortgagee, they do not allege that consent was given. Indeed, plaintiffs submitted to the Court their correspondence with UMB Bank and it is clear from the record that the letters do not constitute written consent. The Court concludes that this

---

[5]Plaintiffs do not contend that the limits of the Subordination Clause on their ability to bring suit are unconscionable or otherwise invalid. Instead, plaintiffs' argument focuses solely on whether the restrictions within the Subordination Clause apply to them.

action was filed without satisfying the applicable prerequisites contained within the financing documents.

Plaintiffs' failure to satisfy the prerequisites will result in the dismissal of those claims the Subordination Agreement properly excludes. The applicable restriction in the Subordination Agreement precludes the filing of any "enforcement action" without the consent of the Senior Mortgagee. An "enforcement action" is one which is "based upon the Subordinate Note or any of the other [financing documents]". (Subordination Agreement, § 1(e)). The parties agree that, upon a finding that plaintiffs were restricted by the Subordination Agreement, the claims for an equitable accounting and breach of contract should be dismissed. Less clear is whether plaintiff's remaining negligence, unjust enrichment, and fraud claims are similarly barred. Because defendant also contends that these claims should be dismissed on alternative grounds as well, the Court will examine each of these claims in turn.

### B. Negligence Claim

In Count I, plaintiffs allege that defendant represented to the Subordinate Bondholders that the project was free of hazardous materials, including lead-based paint, without first fully investigating whether or not such a statement was true. Plaintiffs also allege that defendants attempted to "cover-up" their negligence by intentionally misrepresenting the cost of the lead-based paint remediation as "upgrade" expenses. As an "upgrade" expense, its cost was deducted from the available NOI, which is used to determine how much interest is due to the bondholders. Plaintiffs contend that the cost of removing the lead-based paint

should have been characterized as a capital expense, which would not have been included in calculation of the available NOI. Therefore, plaintiffs claim that defendant's negligence erroneously lowered the NOI and as a result, deprived the bondholders of interest payments. Plaintiffs seek an award, on behalf of all subordinate bondholders, in the amount of the interest payments they would received but for the alleged negligence.

In their opposition to this motion, plaintiffs characterize their claim in Count I as a negligent misrepresentation claim. However, plaintiffs do not allege that they acted in reliance upon any negligent representation made by defendant--- an essential element of a negligent misrepresentation claim. See Stein v. Novus Equities Co., ____ S.W.3d ____, 2009 WL 214342 at *4 (Mo. App. 2009). Instead, Count I more accurately states a simple negligence claim, in that defendant was allegedly negligent in failing to investigate whether the premises contained lead-based paint or other environmental hazards. Plaintiffs' argument is that, due to defendant's failure to ensure that all lead-based paint had already been removed, plaintiffs were financially harmed when defendant subsequently lowered the NOI to cover the expenses of removing the paint.

First, whether plaintiffs and other subordinate bondholders were financially harmed by this alleged negligence is clearly an issue that is "based on" the financing documents, and constitutes an enforcement action under the Subordination Agreement. The financing documents required defendant to make interest payments only to the extent of the available NOI. The issue of whether the NOI was miscalculated, as plaintiffs allege here, is an issue based on the

contract itself. Thus, plaintiff's negligence claim is precluded by the Subordination Agreement because plaintiff did not obtain the consent of the Senior Mortgagee prior to filing a claim based on the financing documents.

Further, plaintiffs' negligence claim is precluded by the economic loss doctrine as well. "The economic loss doctrine prohibits recovery of purely pecuniary losses in tort where the injury results from a breach of a contractual duty." Zoltek Corp. v. Structural Polymer Group, Ltd., 2008 WL 4921611 at *3 (E.D. Mo. 2008). Defendant had a contractual duty to make interest payments, subject to the amount of available NOI. Defendant had a duty under the contract to properly calculate the NOI and make the required payments. Plaintiffs' negligence claim, in essence, states that defendant breached this contractual duty. Because this breach resulted in only pecuniary losses, plaintiffs cannot bring a negligence claim.[6]

### C. Unjust Enrichment Claim

In Count IV, plaintiffs assert an unjust enrichment claim, repeating their contention that, by mis-characterizing the cost of lead-based paint removal, defendant deprived plaintiffs of their interest payments. To state a claim for unjust enrichment, plaintiffs must show: (1) that the defendant was enriched by the receipt of a benefit; (2) that the enrichment was at the expense of the plaintiff; and (3) that it would be unjust to allow the defendant to retain the benefit." Executive Bd. of Missouri Baptist Convention v. Windermere Baptist

---

[6]Further, the fact that plaintiffs' breach of contract claim is barred in this instance by the Subordination Agreement does not indicate that the economic loss doctrine should not apply. The Subordination Agreement does not prevent plaintiff from filing a breach of contract claim; plaintiffs merely failed to follow the established protocol (obtaining consent of Senior Mortgagee/Trustee) prior to doing so.

Conference Center, ___ S.W.3d ____, 2009 WL 230240 at *13 (Mo. App. 2009). "Mere receipt of benefits is not enough, absent a showing that it would be unjust for the defendant to retain the benefit." Miller v. Horn, 254 S.W.3d 920, 924 (Mo. App. 2008). Further, "the existence of a valid and enforceable contract governing the subject matter at issue ordinarily precludes recovery for events arising out of the same." In re Express Scripts, Inc., PBM Litigation, 522 F.Supp.2d 1132, 1148 (E.D. Mo. 2007).

Here, plaintiffs fail to allege that they conferred any benefit upon defendant apart from those benefits governed exclusively by the contracts attached to plaintiffs' petition and relied upon by plaintiffs. Plaintiffs attempt to escape dismissal on this ground by asserting in their memorandum in opposition to this motion that their unjust enrichment claim is merely an "alternative" theory of recovery to their breach of contract claim. Plaintiffs are certainly entitled to bring an unjust enrichment claim as an alternative ground for relief. See Howard v. Turnbull, 258 S.W.3d 73, 76 (Mo. App. 2008). However, a review of the complaint indicates that this is not what plaintiffs are actually doing in this instance. First, in their unjust enrichment claim, plaintiffs explicitly request that they be awarded interest payments due to them "but for the breach of contract" by defendant. Thus, plaintiffs' unjust enrichment claim seeks recovery for events arising solely out of the financing documents. Plaintiffs further request attorneys' fees "as provided for in the financing documents". Count IV clearly incorporates and relies upon the financing documents.

Additionally, without relying exclusively on the contracts, plaintiffs cannot establish that the retention of the funds by defendant was unjust. The money that plaintiffs seek to recover was used by defendant to pay for the cost of the lead-based paint removal from the building. Without relying on the contracts, the Court cannot conclude that keeping the funds for this purpose was unjust. First, removing lead-based paint will increase the value of the property, to the benefit of plaintiffs. Second, other than statements and representations made within the contracts, there is no evidence that defendant should be solely responsible for the cost of removing the lead-based paint. Every alleged representation of defendant concerning the presence or absence of lead-based paint is contained exclusively within the contracts themselves. Plaintiffs have not alleged that defendant made any representations outside of the contract concerning lead-based paint, or otherwise assumed the financial responsibility for its removal. Therefore, the element of "unjust retention" also necessarily relies upon the contracts. For these reasons, plaintiffs' unjust enrichment claim in Count IV is dismissed.

### D. Fraudulent Misrepresentation Claim

In Count V, plaintiffs allege that defendant knew that its representations concerning the absence of lead-based paint were false. Plaintiffs claim that the false representation was intended to, and actually did, induce plaintiffs into financing the project through the purchase of the Series B bonds.

Defendant contends that plaintiffs' fraudulent misrepresentation claim fails for several reasons. First, defendant claims that the evidence attached to the petition directly refutes plaintiffs' allegations of intentional fraud. These pieces of

evidence include two letters sent to defendant from the Missouri Department of Natural Resources and Environmental Operations, Inc. Defendant interprets each of these letters as providing evidence that defendant could not have known that lead-based paint was present at the time it made the alleged misrepresentations. The unfavorable interpretation of two pieces of evidence is not a sufficient ground for dismissing plaintiffs' claims at this time, as additional evidence that supports plaintiffs' claims may be revealed through discovery.

However, defendants also contend that plaintiffs' fraudulent misrepresentation claim is, like the negligence claim, barred by the economic loss doctrine. Defendants point to this Court's decision in Zoltek Corp., where the Court found that a fraud claim "is not outside or collateral to the [contract] and thus is barred by the economic loss doctrine." Zoltek Corp., 2008 WL 4921611 at *4 (E.D. Mo. 2008). While Zoltek is not clearly on point[7], the Court agrees that plaintiffs' fraud claim is barred by the economic loss doctrine. Although there remains no Missouri Supreme Court precedent on this precise issue, a case from this district has found that, under Missouri law, "a fraud claim to recover economic losses must be independent of the contract or such claim would be precluded by the economic loss doctrine." Self v. Equilon Enterprises, LLC, 2005 WL 3763533 at *11 (E.D. Mo. 2005). Where the "substance of plaintiffs' tort claims is for the

---

[7]In Zoltek, it was not alleged that the defendant made the fraudulent representations in order to induce plaintiff to enter the agreement. Here, plaintiffs specifically allege in Count V that, but for the fraudulent representation that the project was free of Hazardous Materials, "plaintiffs would not have purchased the Series B bonds". However, the Court does not believe that this distinction is controlling in this case.

-13-

recovery of losses arising out of the parties contractual relationships", then application of the economic loss doctrine is appropriate.  Id.

Here, plaintiffs suffered no damage outside of what was due to them under the contract.  In other words, their only claim for damages is the interest they had expected to receive under the contracts.  Indeed, in their prayer for relief plaintiffs specifically request "the amount they should have received as interest payments." Under the financing documents, plaintiffs were only entitled to interest if the available NOI remained at a certain level.  Thus, plaintiffs are attempting to "recover in tort for losses that are contractual in nature and [where] the only damages asserted are purely economic losses, lost profits and business and future business expectations".  Id.

The economic loss doctrine is no less applicable in this case simply because plaintiffs alleged that they were induced into purchasing the bonds as a result of defendant's misrepresentations.  It is true that fraudulent inducement claims may often fall outside of the parameters of the economic loss doctrine.  See Marvin Lumber and Cedar Co. v. PPG Industries, Inc., 223 F.3d 873, 885 (8th Cir. 2000). However, "[n]ot all claims of fraud in the inducement of a contract plead breach of a duty extrinsic to the contract." Ice Bowl, LLC v. Weeigel Broadcasting Co., 14 F.Supp.2d 1080, 1083 (E.D. Wis. 1998).  For this reason, an exception exists to the general rule that the economic loss doctrine does not preclude fraudulent inducement claims.  See Marvin Lumber, 223 F.3d at 885-86.  Under this exception, the economic loss doctrine applies to a fraud in the inducement claim when the alleged misrepresentation only concerns the quality of the subject matter

at issue in the contract. See Id. Although the Missouri Supreme Court has not yet taken on the issue of whether this exception applies, the Court is persuaded that its application is consistent with the Missouri precedent currently available.

Here, plaintiffs merely re-style their breach of contract claim as a fraudulent misrepresentation claim. The alleged misrepresentations, of which plaintiffs relied upon, were centered on the quality of the Merchandise Mart building, which was the subject matter of the financing documents. The misrepresentation did not pertain to any matter outside of or collateral to the contracts. Indeed, the misrepresentations were contained, quite literally, inside of the financing documents. Because the alleged misrepresentations concerned only the quality fo the subject matter of the contract, plaintiffs' fraud claim is precluded by the economic loss doctrine and is dismissed.

IV. **Conclusion**

As subordinated bondholders, plaintiffs were bound by the requirement in the Subordination Agreement that they obtain consent of the Senior Mortgagee prior to filing this suit. Further, plaintiffs' negligence and fraud claims are barred under the economic loss doctrine, and plaintiffs' unjust enrichment claim fails to state a valid claim independent of the contracts.

Accordingly,

**IT IS HEREBY ORDERED** that defendant's motion to dismiss [#5] is granted.

A separate order of dismissal will accompany this Memorandum and Order.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 15th day of April, 2009.